1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney

2

3  BARBARA J. VALLIERE (DCBN 439353)
   Chief, Criminal Division

4  JOSE A. OLIVERA (CABN 279341)
   Assistant United States Attorney

5

6       1301 Clay Street, Suite 340S
        Oakland, California 94612-5217

7       Telephone: (510) 637-3924
        Facsimile: (415) 436-7009

8       E-mail: jose.olivera@usdoj.gov

9  Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,              )  CASE NO. 17-CR-114-JST
                                           )
14          Plaintiff,                     )  UNITED STATES' OPPOSITION TO DEFENDANT'S
                                           )  MOTION TO WITHDRAW FROM HIS GUILTY PLEA
15     v.                                  )  OR, ALTERNATIVELY, FOR RESENTENCING
                                           )
16  SHIV D. KUMAR,                         )  Judge:          Hon. Jon S. Tigar
                                           )  Sentencing Date: February 9, 2018
17          Defendant.                     )  Time:           2:00 p.m.
                                           )  Location:       Courtroom 2, 4th Floor
18                                         )                  1301 Clay Street
                                           )                  Oakland, California
19  _____ )

20

21          **REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF THE CASE.............................................................................1

        A.  Background & API's Forms 1120 For 2008, 2009, and 2010 ....................1

        B.  IRS Audit of API & Actions by Defendant and API Employees ..............2

        C.  IRS-CI Criminal Investigation & Pre-Indictment Resolution .................4

        D.  Arraignment, Change of Plea, & Probation.............................................6

        E.  Tax Loss & Sentencing...........................................................................9

III.    ARGUMENT .................................................................................................10

        A.  Federal Rule of Criminal Procedure 11(e) Prohibits Defendant From Withdrawing From The Plea And To Challenge His Guilty Plea He Must Proceed On Direct Appeal Or Collateral Attack. ...................................................................10

        B.  Should The Court Determine That Federal Rule of Criminal Procedure 11(e) is Inapplicable, Defendant Must Proceed Under Fed. R. Crim. P. 11(d)(2) And Show "A Fair and Just Reason For Requesting Withdrawal" In Order To Withdraw His Guilty Plea. ........................................................................................12

            1.  Defendant Entered Into His Plea Agreement Knowingly, Intelligently, and Voluntarily.........................................................................................13

            2.  The Government Did not Breach The Plea........................................17

        C.  Defendant has Been Sentenced, And the Court Should Not Resentence Defendant............19

        D.  Evidentiary Hearing & Fed. R. Evid. 410.............................................20

IV.     CONCLUSION................................................................................................20

1

## TABLE OF AUTHORITIES

2

Cases

3

4 *Anderson*,
970 F.2d ............................................................................................................ 18
5 *Bousley*,
523 U.S., 118 S.Ct. 1604 ................................................................................... 17
6 *Dingle v. Stevenson*,
840 F.3d 171 (4th Cir. 2016) ............................................................................ 11
7 *Henderson*,
at 647 n. 18, 96 S.Ct. 2253 .............................................................................. 17
8 *Hernandez–Herrera*,
273 F.3d ............................................................................................................ 15
9 *Iaea v. Sunn*,
800 F.2d 861 (9th Cir.1986) ............................................................................. 15
10 *Longoria*,
113 F.3d ............................................................................................................ 16
11 *Machibroda v. United States*,
368 U.S. 487, (1962)......................................................................................... 15
12 *United States v. Aguilar-Vera*,
698 F.3d 1196 (9th Cir. 2012) .......................................................................... 13
13 *United States v. Allen*,
434 F.3d 1166 (9th Cir.2006) ........................................................................... 18
14 *United States v. Boatner*,
966 F.2d 1575 (11th Cir.1992) ......................................................................... 18
15 *United States v. Burgard*,
2014 WL 5293222 (S.D. Ill. Oct. 2014) ......................................................... 11
16 *United States v. Cannel*,
517 F.3d 1172 (9th Cir. 2008) .......................................................................... 18
17 United States v. Christakis,
238 F.3d 1164 (9th Cir. 2001) .................................................................... 19, 20
18 *United States v. Davis*,
428 F.3d 802 (9th Cir. 2005) ............................................................................ 12
19 *United States v. Epps*,
2013 WL 3992414 (E.D. Cal. Aug. 2013) ....................................................... 15
20 *United States v. Escamilla-Rojas*,
640 F.3d 1055 (9th Cir. 2011) .......................................................................... 13
21 *United States v. Frye*,
7 F. App'x 621 (9th Cir. 2001).......................................................................... 12
22 *United States v. Goodwin*,
457 U.S. 368 (1982).......................................................................................... 15
23 *United States v. Guzman-Bruno*,
27 F.3d 420 (9th Cir. 1994) .............................................................................. 12
24 *United States v. Hernandez–Martinez*,
2007 WL 3088223 (10th Cir. Oct.23, 2007)................................................... 15
25 *United States v. McTiernan*,
546 F.3d 1160 (9th Cir. 2008) .......................................................................... 13
26 *United States v. Mendez*,
282 F. App'x 153 (3d Cir. 2008) ...................................................................... 14
27 *United States v. Minore*,
292 F.3d 1109 (9th Cir. 2002) .......................................................................... 16
28 *United States v. Nostratis*,
321 F.3d 1206 (9th Cir. 2003) .................................................................... 12, 13

*United States v. Ortega-Ascanio*,
    376 F.3d 879 (9th Cir. 2004) .................................................................................................... 12
*United States v. Pena*,
    314 F.3d 1152 (9th Cir. 2003) .................................................................................................. 16
*United States v. Ramos*,
    923 F.2d 1346 (9th Cir. 1991) ............................................................................................ 13, 14
*United States v. Reynoso-Gonzalez*,
    5 F. App'x 662 (9th Cir. 2001) ........................................................................................... 15, 16
*United States v. Rodriguez-DeMaya*,
    674 F.2d 1122 (5th Cir. 1982) .................................................................................................. 14
*United States v. Ross*,
    511 F.3d 1233 (9th Cir. 2008) ........................................................................................... 14, 15
*United States v. Soto-Diarte*,
    2008 WL 4951414 (D. Kan. Nov. 2008) ................................................................................. 14
*United States v. Storm*,
    2017 WL 1324131 (D. Or. Apr. 2017) ..................................................................................... 15

Statutes

18 U.S.C. § 3583(b)(3) .................................................................................................................. 12
18 U.S.C. § 3664(d)(5) .................................................................................................................. 11
26 U.S.C. § 7201 ........................................................................................................................... 17
26 U.S.C. § 7206(1) ................................................................................................................. 6, 17
United States Code Section 2706 .................................................................................................... 7

Rules

Fed. R. Crim. P. 11 ........................................................................................................................ 15
Fed. R. Crim. P. 11(b)(1) .............................................................................................................. 13
Fed. R. Crim. P. 11(b)(2) .............................................................................................................. 13
Fed. R. Crim. P. 11(d) ................................................................................................................... 11
Fed. R. Crim. P. 11(d)(2) ........................................................................................................... i, 12
Fed. R. Crim. P. 11(f) ................................................................................................................... 20
Fed. R. Crim. P. 35(c) ................................................................................................................... 11
Fed. R. Crim. P. Rule 11(d)(2)(B) .................................................................................... 11, 12, 13
Fed. R. Evid. 410 ...................................................................................................................... i, 20
Fed. R. Evid. 801 ......................................................................................................................... 20
Federal Rule of Criminal Procedure 11(e) ............................................................... i, 10, 11, 12

The United States of America ("Government") respectfully submits the following Opposition to Defendant's Motion to Withdraw From His Guilty Plea Or, Alternatively, For Resentencing.

## I.    INTRODUCTION

Defendant Shiv Kumar received a sentence greater than he anticipated and now seeks to either withdraw from the plea agreement he knowingly, intelligently, and voluntarily entered into, or to be resentenced.  In the more than six months between entering a guilty plea and being sentenced to 18-months in prison, Defendant never requested to withdraw from his guilty plea, never claimed he did not understand the charge against him, never claimed he was unable to understand the change of plea proceeding because of a claimed limited understanding of English, and never accused the Government of making side promises with him or threats against him or his family.  To the contrary, Defendant repeatedly represented to the Court that he understood the charge against him, that he spoke and understood English, that he was satisfied with the performance of his defense counsel, and that no side promises or threats were made to force him to plead guilty.  At his sentencing, Defendant went so far as to say he was ashamed of the tax fraud he committed—but that was before the Court imposed sentence.  Now, after receiving an 18-month term of imprisonment, Defendant has changed his position and seeks any basis to withdraw from his guilty plea.  Had the Court imposed a sentence of probation rather than an 18-month term of imprisonment, Defendant's motion would not be pending before the Court.  Accordingly, the Government requests that the Court deny Defendant's motion in its entirety.

## II.    STATEMENT OF THE CASE

A.  Background & API's Forms 1120 For 2008, 2009, and 2010

From 2008 through 2010, defendant Shiv Kumar was the president and sole shareholder of A-Paratransit, Inc. ("API"), a multimillion-dollar transportation company that transports handicapped and disabled individuals to and from appointments throughout the East Bay. (Exhibit 1, Deposition of Shiv Kumar, at p. 11, lines 19-24 & p. 28, lines1-13; Exhibit 2, API's Forms 1120 for 2008-2010.)  Defendant signed, under penalties of perjury, API's 2008, 2009, and 2010 Forms 1120, Corporation Income Tax Returns, as the president of API and filed them with the Internal Revenue Service ("IRS").  (Exhibit 2.)  Defendant reported that API's gross receipts as follows:

| Year | Date Filed | Form 1120 Reported Gross Receipts |
|---|---|---|
| 2008 | 9/21/2009 | $5,568,148 |
| 2009 | 9/20/2010 | $5,040,958 |
| 2010 | 9/22/2011 | $5,728,546 |
| Total | | $16,337,652 |

1   (*Id.*)  API's Forms 1120 were prepared by David Rutledge of Rutledge Financial Group.  (*Id.*)  In order to prepare

2   API's tax returns, API provided Mr. Rutledge with general ledgers that represented to Mr. Rutledge the total gross

3   receipts received by API for 2008 through 2010.  (Exhibit 3, Rutledge Memorandum of Interview ("MOI"), ¶¶ 7-

4   8.)  The general ledgers API provided to Mr. Rutledge did not include income API received and deposited into (1)

5   Bank of the West bank account x0608, or (2) U.S. Bank account number x7181, both of which were in the name

6   of API and opened by Defendant, or that he directed be opened. (Exhibit 4, Bank of the West and U.S. Bank

7   Records; Exhibit 5[1], Government Bank and General Ledger Summary Analysis.)  Exhibit 5 identifies unreported

8   income deposited into API's bank accounts, but not reported on its Forms 1120 for 2008, 2009, and 2010. (*Id.*)

9   As Exhibit 5 shows, for 2009 and 2010, the deposits into account x0608 and x7181 were not listed on the general

10  ledgers provided to Mr. Rutledge, which he used to prepare API's Forms 1120 for those years. (*Id.*)

11      B.  IRS Audit of API & Actions by Defendant and API Employees

12          In or around November 2011, the IRS initiated a civil audit of API, and requested API provide various

13  financial records.  (Exhibit 6, IRS Document Request.)  Revenue Agent James Ackerman was assigned to conduct

14  the audit and requested, among other things, "Bank reconciliation or statements for all bank accounts for the

15  period 12/1/2008 through 1/31/2010" from API.  (*Id.*, at ¶ 1.)  API provided numerous records to the IRS and, in

16

17

18

19

20

21

22

23  ***Defendant Amends API's Forms 1120 For 2008, 2009, & 2010 & Reports Previously Unreported Income***

24          From late 2011, continuing into 2013, the IRS conducted its audit of API.  In mid-2012, after the IRS had

25  begun auditing API, Defendant signed under penalties of perjury, and filed with the IRS, API's Forms 1120X,

26  Amended U.S. Corporation Income Tax Returns for 2008, 2009, and 2010. (Exhibit 8, API's Forms 1120X for

27

28

---

[1] These computations include bank deposits and do not include all cash receive by API from 2008 through 2010.

2008-2010.)  In order to have those returns prepared, API provided revised 2008, 2009, and 2010 general ledgers to DHZ Phillips, LLP, API's new tax return preparers.  Those ledgers reflected income deposited into the undisclosed accounts, bank accounts x0608 and x7181. (*Id*.)  By filing the amended tax returns, Defendant admitted API underreported its income on its Forms 1120 by at least the amounts shown in the table below.

| Year | Form 1120X Reported Gross Receipts | Form 1120 Reported Gross Receipts |
|------|------|------|
| 2008 | $5,601,536 | $5,568,148 |
| 2009 | $6,506,206 | $5,040,958 |
| 2010 | $6,944,325 | $5,728,546 |

### IRS Audit Deposition of Defendant Conducted In English[2]

Also during the IRS audit, on December 18, 2012, from 10:05 a.m. to 12:20 p.m., Revenue Agent Ackerman and IRS Counsel Jon Feldhammer deposed Defendant, in English, and under oath. (Exhibit 1, Kumar Deposition.)  All questions were asked in English and all answers by Defendant were given in English. (*Id*.) The transcript is more than a hundred pages and Defendant was represented by counsel throughout. (*Id*.)

During that deposition, Defendant was told that if he did not understand "the terminology in English, we do have an agent here who speaks Hindi, so please let me know if you don't understand something." (*Id*.) Defendant acknowledged that he understood and never asked for any interpretation. (*Id*. at p. 6, lines 11-15.) Revenue Agent Ackerman asked Defendant "are you able to understand and speak English fluently" and Defendant responded "Just like the last time, I talked to you about the legal language, probably."  Mr. Ackerman responded, "Okay, but regular English discussions are" and Defendant interjected stating: "Normal, you know, best I can." (*Id*. at p 8, lines 1-10.)  Defendant went on to give responsive answers to questions about whether he had an alcoholic drink, whether he was ill, and under the care of a doctor. (*Id*. at p. 8-9.)  He confirmed he completed the eighth grade and "left school in 9th." (*Id*. at p. 11, lines 1-6.)  Defendant also said he started API in 1996 and that he was the sole shareholder and president of API. (*Id*. at p. 11, lines 19-24, lines 22-24 & p. 28, lines 1-13.)

In several portions of the deposition, Defendant explained his involvement with API.  For example, he stated his duties were to handle the operations side of the business, such as making sure the vehicles were running properly, helping mechanics with their work, and ensuring the drivers went out on time—all in English. (*Id*. at p.

---

[2] The page numbers cited in this section are contained at the top right-hand corner of the transcript in yellow highlight.

12.)  He also stated part his duties were to "get the manifest from the drivers, you know, and look at those, the manifest, to make sure they fill out proper. So then, I just send them to East Bay." (*Id*. at p. 13, line 23-p. 14, line 2.)  Defendant told the IRS how API bid for the contract with East Bay Paratransit, its largest contract, the way pricing worked, and when pressed on whether he thought the contract would be profitable, he stated, "yeah, I'm thinking I'm going to make money." (*Id*. at pp. 38-43 & p. 46, lines 3-6). He explained that he thought he would make money "Because I'm  a hard working person and, you know makes sure I keep my vehicle run all the time and, you know, hard working guy." (*Id*. at p. 46, lines 3-10.)  Additionally, Defendant told the IRS about the relationship between Veolia and East Bay Paratransit: "East Bay Paratransit, they organize AC Transit and Bart. And Veolia, he's the broker. He bid on the contract with the brokers so we have a contract with the brokers, subcontract with the brokers. So AC Transit and Bart, they organized to be hired broker and broker hire the providers." (*Id*. at p. 70, lines 5-22.)

Finally, Defendant told the IRS that he had had foreign bank accounts and that he took money from API to purchase real estate, including property in Vallejo. (*Id*. p. 83-85; p. 100, line 23-p. 102.)

At the end of the deposition, the IRS employees and Defendant both apologized for not always fully understanding each other, but the IRS stated that they were able to understand him. (*Id*. at p. 110, lines 7-10.)

C.   IRS-CI Criminal Investigation & Pre-Indictment Resolution

IRS-Civil referred this matter to IRS Criminal Investigation ("IRS-CI"), and IRS-CI began an investigation into the unreported income on API's Forms 1120.  After obtaining tens of thousands of bank and other financial records, IRS-CI determined that API had underreported millions of dollars of income deposited into two undisclosed accounts, x0608 and x7181.  (*See* Exhibit 5.)

The evidence confirms the informant's statements. (Exhibit 5; Exhibit 3.)  Mr. Kumar admitted to these facts in his plea agreement. (Exhibit 10, Plea Agreement.)

On July 19, 2016, Roger Patton, Defendant's attorney, sent an email to Tom Moore, Chief of the Tax Division for the U.S. Attorney's Office for the Northern District of California, inquiring about the investigation

1   into API. (Exhibit 11, July & August 2016 Emails From Attorney Roger Patton, p. 3.)  Subsequently, the

2   undersigned and Rebecca Sable, trial attorney with the U.S. Department of Justice, Tax Division, contacted Mr.

3   Patton and agreed to meet with him on or about August 8, 2016. (*Id*. at p. 11, p. 1-2.)  During the August 8, 2016

4   meeting the undersigned and Ms. Sable met with Roger Patton and provided him with a background of the

5   investigation, an estimate of the tax loss caused by Defendant, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  The

7   Government told Mr. Patton that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Never did the Government threaten or promise to charge Defendant's family

9   members if Defendant did not plead guilty. (*Id*. at ¶ 6.)  In fact, Mr. Patton expressed an interested in attempting

10  to resolve this matter and the Government agreed to discuss a potential resolution. (*Id*. at ¶ 6.) In August 2016, the

11  Government and the Defendant agreed to enter into a tolling agreement in order to toll the statute of limitations on

12  potential tax crimes committed by Defendant in order for Defendant and the Government do discuss resolving the

13  matter. (*Id*.)

14          After the initial meeting, the Government had another meeting with Mr. Patton and Chris Cannon.  The

15  undersigned counsel, Rebecca Sable, and IRS Special Agent Chancelor Williams were present. (*Id*.) ▓▓▓▓▓▓▓

16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  At no time were any threats or promises

18  made that others would be or would not be prosecuted.  (*Id*.)  On November 17, 2016, the Government provided

19  Mr. Patton with a draft plea agreement. (Exhibit 12, November and December 2016 Emails From Roger Patton.)

20  Mr. Patton explained that he would discuss the draft plea agreement with his client, and, on December 1, 2016,

21  Mr. Patton stated that Defendant was interested in pursuing a plea agreement:

22          Jose and Rebecca, We discussed the plea agreement and my client is interested but has questions, Can I
        and my cocounsel Chris Cannon meet with you to discuss the questions we have so that we hopefully can
23      move to resolution? I and my co-counsel are available Tuesday afternoon if that is available to you.

24  (*Id*.)  After discussions regarding changes to the plea agreement, on January 27, 2017, the undersigned provided

25  Mr. Patton and Mr. Cannon with revised draft computations for API, a draft information, and a revised draft plea

26  agreement and stated:

27          The attached documents are only drafts. Also, the computations, should this case proceed
        forward without an early resolution, will likely change. We intend to submit these documents to
28      my office for review today and to the Tax Division in Washington, DC, sometime early next

US' Opposition To Def's Motion to Withdraw from Plea

week. Before I do, do you have any issues with the documents before we submit them for review on my end?

(Exhibit 13, Email with Comps, Plea, and Information.)  After making some modifications and the defenses request, on February 16, 2017, Defendant signed a copy of the plea agreement—weeks before he was charged and more than a month before his arraignment and change of plea. (Exhibit 14, February 2016 Signed Plea Agreement.)  Before filing the Information in this case, the undersigned contacted Mr. Cannon and made clear that the Government was not making any promises regarding other family members and specifically stated that the Court, as is required, would ask if there were any side deals or promises and the Government was not making any such promises. (Olivera Decl. ¶ 8.) ██████████████████████████████████

████████████████████████████████████████████████████ (Olivera Decl. ¶ 8.) There was no coordinated plan or attempt to keep any side promises from the Court as there were no promises. (*Id.*)

    D.   <u>Arraignment, Change of Plea, & Probation</u>

On March 7, 2017, the Government charged Defendant by information with one count of making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). (Dkt. No. 1.)  On March 22, 2017, Defendant was arraigned. (Dkt. No. 1.)  At Defendant's arraignment, the Government stated that Defendant was "charged by information with one count of making and subscribing a false U.S. Corporation income tax return for 2010, in violation of 26 U.S.C. 7206(1)." (Exhibit 15, Arraignment Transcript, at p. 4, lines 15-18.)  Mr. Kumar stated "Yes" when asked if he understood the charge against him. (*Id.*, at p. 4, line 24-p. 5, line 5.)  Magistrate Judge Westmore explained to Defendant that he had a right to have a grand jury indict him and was not required to waive his indictment as he was only charged by information. (*Id.* at p. 5, lines 12-25.)  Defendant stated he understood he had a right to indictment by a grand jury and wished to waive that right.  (*Id.*, at p. 6, lines 9-17.)  Defendant was specifically asked: "have any threats or promises been made to induce you to waive indictment" and he responded "No". (*Id.* at p. 6, lines 12-14.) The United States' provided Defendant with over 50,000 pages of discovery.

***Change of Plea Hearing***

Two days after arraignment, on March 24, 2017, Defendant pleaded guilty to one count of making and subscribing a false tax return.  (Dkt. No. 8.)  During that hearing, the Court thoroughly advised Defendant of the

1   charge against him and the rights he would be waiving, among other things, if he pleaded guilty.  Defendant was

2   placed under oath and swore to tell the truth.  (Exhibit 16, Change of Plea Transcript, p. 25, lines 11-16.) At the

3   start of the hearing the Court told the Defendant that "the purpose of the hearing is for me to make sure that

4   you've had enough time to do the thinking and reading and talking to Mr. Patton that you need to do to make a

5   good decision. Okay?" and "to make sure that you know what you're getting out of this plea agreement and what

6   you're giving up, what the rights you're giving up and so forth." (*Id*. at p. 3, 3-11.)  Defendant said "yes" to both

7   questions. (*Id*.) The Court told the Defendant, "the most important thing this morning is that you hear and

8   understand everything that's going on. So that means if you don't hear something that I say or one of the lawyers

9   says, will you please interrupt me or have Mr. Patton interrupt me so it could be repeated?" (*Id*. p. 3, lines 13-18.)

10  Defendant responded, "Yes Your Honor" and thanked the Court. (*Id*. at p. 4, line 19.)

11          The Court asked questions about Defendant's name, the spelling of his name, where he was born, and his

12  citizenship. (*Id*. at p. 6, lines 5-14.)  Mr. Kumar gave responsive answers to each question, giving his name,

13  stating he was born in India, and that he was a United States citizen. (*Id*. at p. 6, lines 5-14.)  Defendant stated he

14  completed the eighth grade, agreed that he owned his own business, and when asked by the Court "I take it from

15  that that your reading and writing is strong; is that true?" said "Yes, Your Honor." (*Id*. at p. 6-7.)  When asked if

16  he had "any difficulty reading any of the documents in this case, Defendant responded "No, Your Honor". (*Id*. p.

17  7, lines 7-9.) He also agreed that he went over the charge in the Information with his attorney, had enough time to

18  speak to his attorney, and was satisfied with the advice he received.  (*Id*. at p. 7 lines 17-p. 8, line 2; p. 8, lines 3-

19  9.)  He admitted he had the opportunity to read and discuss the plea agreement with Mr. Patton before he signed

20  it. (*Id*. at p. 8, lines 19-25.)  The Court asked in two separate instances whether there were any side deals or

21  promises not in the plea agreement—Defendant stated "No" both times. (*Id*. at p. 9, lines 10-22.)  The Court also

22  asked if he had been threated to accept the plea agreement and Defendant started "No." (*Id*. p. 10, lines 3-5.)

23          The Court advised Defendant he could <u>not</u> withdraw from his plea agreement "even if the sentence is

24  higher than what you thought it was going to be." (*Id*. p. 10, lines 21-25.) Defendant stated he understood. During

25  the change of plea, the Court told Defendant that he was pleading to a felony, that would lose certain rights and

26  Defendant stated he understood. (*Id*. at p. 11, lines 1-8.)  The Court told Defendant that the "government charged

27  you with a single count of making and subscribing a false tax return in violation of Title 26, United States Code

28  Section 2706 subpart 1." (p. 16, lines 20-22.)   The Court told Defendant of that the elements of the charged

offense were:

- Number one, that you signed and filed a U.S. Corporation Income Tax Return, which is call a Form 1120, for the year 2010 that you knew contained false information as to a material matter.
- Number two, that that tax return had a written declaration that it was being signed subject to the penalties of perjury.
- And number three, that in filing that false corporate tax return, you acted willfully, which essentially means you knew that the return contained false information.

(*Id.* p. 17, lines 1-11.) Defendant agreed that he understood that the Government would have to prove those

elements if he went to trial. (*Id.* at line 12.)

The Court asked the Defendant to say in his own words why he was pleading guilty and Defendant

admitted "one of the bank account is not showing onto the tax return," exactly what happened in this case. (*Id.* at

p. 18, 5-8.) The Court inquired further and stated that its "job [was] to make sure I don't let anybody plead guilty

if they didn't really do the crime and if they don't really think they did the crime." (*Id.* at p. 18, lines 14-20.) The

Court proceeding to ask the following, which Defendant admitted to:

- The Court: "So you opened a bank account. It wasn't on your – on your – that you didn't report on your tax return. And did you put proceeds from your business into the bank account?
- The Defendant: Yes. Yes, Your Honor.
- The Court: Okay. And that's the money that didn't show up on your tax returns.
- The Defendant: Yes, Your Honor.
- The Court: And did you do the same thing in 2009 and 2010?
- The Defendant: Yes, Your Honor.
- The Court: And the amounts that I read into the records a second ago, two million and change in one year and two million and change in the other year; were those amounts accurate?
- The Defendant: Yes, Your Honor.
- The Court: Oh, and were you the person that signed the Form 1120 for those two tax years?
- The Defendant: Yes, Your Honor
- The Court: Did it say on the tax return that it was being signed subject to the penalty of perjury? Does it say that on there?
- The Defendant: Yes, Your Honor

The undersigned then stated that if this case were to proceed to trial, it would be prepared to prove the

following at trial: that the Defendant knowing and willfully filed U.S. corporation income tax returns for A-

Paratransit, Inc., for 2009 and 2010, that the returns were false because "they underreported gross receipts that A-

Paratransit Inc. received in connection with its business," that the unreported income was not disclosed to his tax

return preparer, and that the unreported amounts were used to purchase real property. (*Id.* at p. 20, lines 9-20.)

Defendant changed his plea and not once claimed he could not understand the proceeding or charges, could not

understand English, was dissatisfied with his attorney, or that the Government had made promises apart from the

1   plea agreement. (*Id.*) After entering his plea, Defendant met with Probation and provided substantial information

2   in English regarding his background, his family, and his finances. (Exhibit 17, PSR, ¶ 33-51.)

3       E.   Tax Loss & Sentencing

4           One or two days before Defendant's July 7, 2017 sentencing, the undersigned received an email

5   and a phone call from Mr. Cannon regarding the tax loss amount set forth in the plea agreement.

6   (Olivera Decl. ¶ 9.)  Mr. Cannon told the undersigned that the tax loss figure agreed to was incorrect and

7   that he wanted to continue the sentencing hearing in order to discuss the matter further.  (Olivera Decl.

8   ¶ 9.)  On July 6, 2017, Defendant filed a stipulation requesting that the sentencing be continued in order

9   to allow the "parties to work out a minor dispute regarding some calculations," which referred to the tax

10  loss figure in the plea agreement. (Dkt. No. 13.) Although Defendant had agreed not to challenge the

11  Guidelines, which includes the tax loss agreed upon, the Government reanalyzed the tax loss in order to

12  ensure the tax loss was correct. (Exhibit 10, ¶¶ 7 & 14; Dkt. No. 17.)  In its supplemental sentencing

13  memorandum, the Government explained the corrected tax loss computations, including tax loss for

14  2008, which all years together still exceeded $1.5 million and did not change the Guidelines. (Dkt. No.

15  17.)  Before filing its supplemental sentencing memorandum, Mr. Cannon and the undersigned

16  discussed the tax loss and were in agreement that the tax loss would be over $1.5 million dollars.

17  (Exhibit 18, 9/29/2017 Email from Mr. Cannon.)  In fact, the undersigned specifically asked if the

18  Defendant disputed the tax loss and Mr. Cannon stated:

19          I am not trying to get out of the plea agreement, but I do think we should get on the same page as
            to the actual numbers. We may want to say something like: The numbers in the plea agreement
20          were the product of negotiation and compromise by both sides, the parties have discovered that the
            numbers in the plea agreement, potentially overstate the financial loss, and it is possible the
21          guidelines should be two levels lower. On the other hand, there are other issues and other years,
            that with additional investigation could potentially lead to a higher guideline calculation. Due to
22          this uncertainly, and because to the plea agreement, the parties do not object to the loss
            calculations in the PSR, which are based on the plea agreement, but acknowledgement that
23          calculation could overstate the tax loss in 2009 and 2010.

24

25  (*Id.*)  In fact, the undersigned sent a draft of the Government's supplemental sentencing memorandum to

26  Mr. Cannon before filing. (Exhibit 18., at p. 5.) Defendant supplemental sentencing memorandum filed

27  on October 4, 2017, signed by defense counsel, states "We are not disputing the tax loss, but would just

28  like to point out that the difficult in coming to firm tax loss numbers . . . ." (Dkt. No. 18, at p. 3, line 4.)

At sentencing, on October 6, 2017, the Court asked if there were any objections and the Government pointed out the correction to the tax loss in the plea agreement, which lowered the tax loss by about $40,000. (Exhibit 19, Sentencing Transcript, at p. 3, lines 18-21.)  Mr. Cannon stated it is not necessary to object as "the guidelines don't really change." (*Id*. at p. 4, lines 2-4.)  The Court adopted the parties' sentencing guidelines calculation at over $1.5 million dollars without objection by the defense. (*Id*., at p. 4, lines 23- p. 5, line 1.) During sentencing, Mr. Kumar addressed the Court and stated "I came to America in 1981 and American people give me good opportunity to live here, and what happened with the tax I'm really sorry it happened. I lost my respect from my community, my family, shame. I won't happen anymore. I'm sorry. Thank you." (*Id*. at p. 9, lines 11-5.) The Court pronounced a sentence of 18 months, three years supervised release, and restitution to be determined. (*Id*. at pp. 14-15 & Dkt. No. 19.) Before the Court could complete the hearing on restitution, Defendant appeared to suffer from a medical emergency and the Court continued the sentencing to impose restitution and set a surrender date. (Dkt. No. 19.)  The Court specifically stated in its minute order, "The Court pronounced the sentence as follows: The Defendant is committed to the custody of the Bureau of Prisons for a term of 18 months; 3 years supervised release with the special conditions set forth in the judgment." (Dkt. No. 19, ¶ 1.) The only issues remaining for the Court to resolve was the surrender date and restitution. (*Id*.; Exhibit 19, at p. 9, lines 28-29.)  Defendant now seeks to withdraw from his guilty plea.

## III.   ARGUMENT

Defendant makes two overarching arguments in his motion.  He first contends that the Court should allow him to withdraw from the plea agreement because (1) the plea was not knowing, intelligent and voluntary, and (2) because the Government breached the plea agreement when it included tax loss agreed to by the Defendant. Second, in the alternative, Defendant contends that even if he is not permitted to withdraw from his guilty plea, the Court should resentence the Defendant because (1) defense counsel was conflicted during Defendant's sentencing, and (2) because the government made improper arguments regarding tax loss.  The Government will address each argument in turn, but will first address the preliminary jurisdictional issue of whether the Defendant has already been sentenced.

### A.  Federal Rule of Criminal Procedure 11(e) Prohibits Defendant From Withdrawing From The Plea And To Challenge His Guilty Plea He Must Proceed On Direct Appeal Or Collateral Attack.

Rule 11 of the Federal Rules of Criminal Procedure provides a defendant with two paths to challenge his

1   guilty plea. *See* Fed. R. Crim. P. 11(d) & (e).  The first, contained in Rule 11(d), permits a defendant to "withdraw

2   a plea of guilty" after the court has accepted the plea, but before sentencing, when the "the defendant can show a

3   fair and just reason for requesting the withdrawal." Fed. R. Crim. P. Rule 11(d)(2)(B).  The second, contained in

4   Rule 11(e), states that "After the court imposes sentence, the defendant may not withdraw a plea of guilty or

5   nolo contendere, and the plea may be set aside only on direct appeal or collateral attack." Fed. R. Crim.

6   P. Rule 11(d)(2)(B).  The Advisory Committee notes for Rule 11(e) state "the provision makes it clear

7   that it is not possible for a defendant to withdraw a plea after sentence is imposed." *United States v.*

8   *Burgard*, 2014 WL 5293222, at *1 (S.D. Ill. Oct. 2014), *aff'd* (Feb. 19, 2015).

9   　　　The question here is whether defendant has been sentenced.  Sentencing is defined as "the oral

10  pronouncement of the sentence." Fed. R. Crim. P. 35(c).  At Defendant's October 16, 2017 sentencing

11  hearing, "The Court pronounced the sentence as follows: The Defendant is committed to the custody of the

12  Bureau of Prisons for a term of 18 months; 3 years supervised release with the special conditions set forth in the

13  judgment." (Dkt. No. 19, ¶ 1.)  While the Court also stated "The Proceedings were halted before pronouncement

14  of sentence was complete due to the Defendant experiencing a medical emergency," a reading of the transcript

15  clearly shows that the only remaining issues were restitution and surrender date. (*Id.*; Exhibit 19, at p. 9, lines 28-

16  29.)  The fact that the Court did not impose restitution at the October 6, 2017 sentencing does not change the fact

17  that it pronounced sentencing. *See* 18 U.S.C. § 3664(d)(5) (the court has at least 90-days after sentencing to

18  impose restitution).  While Defendant's medical emergency at sentencing may have delayed the completion of all

19  aspects normally covered at sentencing, such as restitution and surrender date, for all intents and purposes the

20  sentence was orally announced and, according to Rule 35(c), defendant can only challenge his plea on direct

21  appeal or by collateral attach. Fed. R. Crim. P. 11(e).  A defendant is not allowed to engage in the sort of

22  gamesmanship the Defendant has engaged in just because he dislikes his sentence.  *See Dingle v. Stevenson*,

23  840 F.3d 171, 174 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 2094 (2017) ("Pleading guilty typically

24  entails a deliberate choice to accept the risks and rewards of a deal, and that decision may not be

25  casually set aside on the basis of buyer's remorse."); *United States v. Martinez*, 2014 WL 1267125, at *5

26  (E.D. Tex. Mar. 2014), *aff'd*, 616 F. App'x 131 (5th Cir. 2015) ("Just because Defendant has buyer's

27  remorse is not a ground for withdrawing a guilty plea.")  Importantly, the Government is concerned that

28  should the Court permit the Defendant to withdraw from his plea or resentence him, and at the

1    culmination of the new proceeding he is found guilty and resentenced to a term displeasing to him, he

2    may challenge the Court's order by asserting the Court was prohibited from permitting him to withdraw

3    his guilty plea.

4          In addressing this issue in his motion, Defendant indicates that should the Court follow the

5    position taken by the Government at the November 17, 2017 hearing, it will waste judicial resources.

6    He makes this claim because the supervised release term imposed exceeded the maximum term, which

7    would have been corrected had Defendant not experienced a medical issue. *See* 18 U.S.C. § 3583(b)(3).

8    Although the term is incorrect, the Court would not be required to conduct the entire sentencing again.

9    The Ninth Circuit has commonly remanded cases for "the limited purpose" of modifying the supervised

10   release term.  *See United States v. Frye*, 7 F. App'x 621, 622 (9th Cir. 2001), supplemented, 41 F. App'x

11   111 (9th Cir. 2002) (affirming district court's sentence, but remanding for the limited purpose of

12   modifying the defendant's supervised release term from five years to three years.) *United States v.*

13   *Guzman-Bruno*, 27 F.3d 420, 423 (9th Cir. 1994), *as amended* (Sept. 23, 1994) (district court imposed a

14   five year term of supervised release against defendant, which exceed the three year maximum.  The

15   Ninth Circuit vacated that "part of the sentence and remand to the district court for the limited purpose

16   of setting a term of supervised release within the statutorily permitted range.").  Accordingly, the Court

17   should impose restitution and set a surrender date at the February 9, 2018 hearing.

   **B.   Should The Court Determine That Federal Rule of Criminal Procedure 11(e) is**
18   **Inapplicable, Defendant Must Proceed Under Fed. R. Crim. P. 11(d)(2) And Show "A**
   **Fair and Just Reason For Requesting Withdrawal" In Order To Withdraw His Guilty**
19   **Plea.**

20

21         Defendant may withdraw his guilty plea prior to sentencing if he demonstrates a "fair and just

22   reason for withdrawal." Fed. R. Crim. P. 11(d)(2)(B). Defendant has the burden of demonstrating the

23   "fair and just reason." *United States v. Davis*, 428 F.3d 802, 805 (9th Cir. 2005). "Fair and just reasons

24   for withdrawal include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening

25   circumstances, or any other reason for withdrawing the plea that did not exist when the defendant

26   entered his plea." *Id*. (quoting *United States v. Ortega-Ascanio*, 376 F.3d 879, 883 (9th Cir. 2004)).

27   "[T]he decision to allow withdrawal of a plea is solely within the discretion of the district court." *United*

28   *States v. Nostratis*, 321 F.3d 1206, 1208 (9th Cir. 2003).

Under Fed. R. Crim. P. 11(d)(2)(B), Defendant makes two arguments for why he should be allowed to withdraw his guilty plea: (1) that the Rule 11 plea colloquy was inadequate; and (2) because the Government breached the plea agreement.  Both are erroneous.

1. <u>Defendant Entered Into His Plea Agreement Knowingly, Intelligently, and Voluntarily.</u>

Rule 11 "exists to ensure that guilty pleas are knowing and voluntary." *United States v. Aguilar-Vera*, 698 F.3d 1196, 1201 (9th Cir. 2012).  Rule 11 requires that before accepting a defendant's guilty plea that the court "address the defendant personally in open court." Fed. R. Crim. P. 11(b)(1) "During this address, the court must inform the defendant of, and determine that the defendant understands" his rights, the nature of his charges to which he is pleading guilty, among other things. *Id.*; *United States v. Escamilla-Rojas*, 640 F.3d 1055, 1059 (9th Cir. 2011).  The "court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in the plea agreement)." Fed. R. Crim. P. 11(b)(2). Courts uniformly analyze motions to withdraw guilty pleas in "the context in which the motion arose to determine whether" a "fair and just reason exists." *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008). Among the factors considered is the reason and timing for the request. *United States v. Nostratis*, 321 F.3d 1206 (9th Cir. 2003). A defendant "cannot plead guilty to 'test the weight of potential punishment' and then withdraw their plea if the sentence is "unexpectedly severe." *United States v. Ramos*, 923 F.2d 1346, 1359 (9th Cir. 1991), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001).

Defendant asserts that his plea was not knowing, intelligent, and voluntary because: (i) he lacked the ability to understand the change of plea proceeding due to his limited ability to understand English; (ii) he falsely claims he was forced to plead guilty based on threats or side promises; and (iii) the "willfulness" element of the charged crime was incorrectly defined at the change of plea hearing—essentially arguing that Defendant was unaware he was required by law to file a correct tax return. Each is addressed in turn.

      i.   *Defendant Speaks and Understands English More Than Sufficiently Well to Enter Into A Plea Agreement Knowingly and Voluntarily.*

Rule 11 requires an understanding of the nature of the charges, among other things.  Where a defendant's change of plea hearing is conducted entirely in English and where he does not understand the proceeding due to his inability to understand the English language, then the voluntariness of the plea

1   is correctly at issue. But Defendant is not such a person.

2          Defendant has lived in the United States since 1981, opened API in 1996, is the president and sole

3   shareholder of API, a multimillion-dollar transportation company, purchases numerous properties by his own

4   admission, and actually speaks and understands English.  (Exhibit 1, at p. 11, lines 19-24 & p. 28, lines1-13;

5   Exhibit 2; Exhibit 17, ¶ 33-51.)  Defendant gave responsive questions to questions asked in English at his

6   arraignment, at his change of plea, at sentencing, and at his two hour deposition with the IRS.  (Exhibits 1,

7   15, 16, & 19.).  At his deposition, he gave responsive questions to questions in English on a variety of

8   topics, including his age, his education, medical condition, and role at API.  (Exhibit 1.) At no time did

9   Defendant receive any interpretation. (*Id.*)  He time after time affirmed to the Court that he understood

10  the proceedings and understood English.  In deciding a motion to withdraw a plea of guilty, "statements

11  made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent

12  proceedings attacking the plea." *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008).

13         Defendant will surely point to aspects in the record that he claims show he was not educated in

14  the United States and is more comfortable in other languages.  But a defendant need not be a professor

15  in English, or be fluent or proficient in English to satisfy the knowing and voluntariness standard under

16  Rule 11.  *See United States v. Mendez*, 282 F. App'x 153, 155 (3d Cir. 2008) (defendant challenged that

17  his plea was not knowing, voluntary, and intelligent under Rule 11 because, among other things, he "was

18  not fully conversant in the English language." The defendant on the record stated he could "read it and

19  understand it a little bit." The Court, relying on defendant's statements at the hearing demonstrated he

20  understood as he gave responsive answers and there was no reason to believe that the defendant was

21  "inhibited due to any deficiencies in his ability to understand English."); *United States v. Rodriguez-

22  DeMaya*, 674 F.2d 1122, 1123 (5th Cir. 1982) (defendant attempted to withdraw her guilty plea based

23  on her limited understanding of English and Spanish, but based on her colloquy answers, the court

24  determined her plea was knowing, intelligent, and voluntary); *United States v. Soto-Diarte*, 2008 WL

25  4951414, at *3 (D. Kan. Nov. 2008) (rejecting defendants claim his plea was involuntary because he had

26  limited English ability: "[A]t no time during any of the proceedings in this case—particularly the Rule

27  11 colloquy—did Mr. Soto–Diarte request the assistance of a translator or in any way indicate that he

28  was having difficulty understanding the nature of the proceedings or the questions directed to him.");

1   *United States v. Hernandez–Martinez,* 2007 WL 3088223, at *2 (10th Cir. Oct.23, 2007) (rejecting

2   defendant's argument that his appeal waiver was not knowing and voluntary because he was not a native

3   English speaker and only understood "a bit of English." Record of the plea hearing indicated full

4   understanding of English.); *United States v. Epps*, 2013 WL 3992414, at *4 (E.D. Cal. Aug. 2013)

5   ("Nothing in the record raises any question about defendant's ability to read, write or understand the

6   proceedings or the English language. Movant was given every opportunity to ask for clarification from

7   the court or his counsel if he did not understand the terms of the agreement, and he did not.")

8       Moreover, Defendant's own expert states that Defendant understands English as he is "able to

9   understand clearly articulated speech about areas of immediate personal relevance and experience."

10  (Dkt. No. 30-3, ¶ 5.) The Court should reject this argument.

11              ii.    *Government Made No Threats To Defendant's Family and There Were No Side Agreements.*

12      There were no side promises in this case. "A guilty plea, if induced by promises or threats which

13  deprive it of the character of a voluntary act, is void." *Machibroda v. United States*, 368 U.S. 487, 493,

14  (1962); Fed. R. Crim. P. 11.  In deciding a motion to withdraw a plea of guilty, "statements made by a

15  defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings

16  attacking the plea." *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008). "To determine

17  voluntariness, we examine the totality of the circumstances." *Iaea v. Sunn,* 800 F.2d 861, 866 (9th

18  Cir.1986).

19      Defendant signed the plea agreement on two different dates, February 16, 2017, and March 24,

20  2017, both of which contained a paragraph that all promises were contained in the plea agreement.

21  (Exhibit 10 & 14.)  At the change of plea hearing, Defendant admitted there were no side-promises and

22  that he was not entering into the plea agreement under threat. (Exhibit 16.); *United States v. Reynoso-*

23  *Gonzalez*, 5 F. App'x 662, 663–64 (9th Cir. 2001) (finding no promises where government attorney

24  submitted declaration that no promises were made and defendant confirmed no promises during his

25  change of plea.)

26      Defendant paints a picture of the Government forcing Defendant to plead guilty through threats

27  or promises.  Looking at this case in its totality, the falsity of Defendant's accusations are glaring.  The

28  Government was investigating the underreporting of income from API when Defendant's attorney

1   contacted the Government and sought to resolve this case. (Exhibit 11.)  Although the Government

2   agreed to discuss a potential resolution, it was Defendant who came forward and wanted to resolve this

3   case during the Government's investigation. During the August 8, 2016 meeting the undersigned met with

4   Roger Patton and provided him with a background of the investigation, an estimate of the tax loss caused by

5   Defendant

6

7

8

9   Never did the Government threaten or promise to charge Defendant's family members if Defendant did not plead

10  guilty. (*Id*. at ¶ 6.)  The Government repeated this on several occasions as the topic was raised. Nothing in the

11  Government's communications with Mr. Patton and Mr. Cannon show any side promises or threats. The

12  Government worked with the Defendant's counsel for six months discussing resolution. Had the Government

13  made threats, presumably the plea would have gone much faster. There was no coordinated plan or attempt to

14  keep any side promises from the Court because there were no promises. (*Id*.)  Defendant relies solely on an

15  editorialized email that makes inferences. No promises were made.  This challenge fails.

16          *iii.    The Intent Element Definition Was Adequate*

17          "To comply with Rule 11(c)(1)'s requirement that the defendant be informed of the "nature of the

18  charge," the district court must advise the defendant of the elements of the crime and ensure that the

19  defendant understands them. *United States v. Minore*, 292 F.3d 1109, 1115 (9th Cir. 2002) (citations

20  omitted).  A "defendant's right to be informed of the charges against him is at the core of Rule 11, which

21  exists to ensure that guilty pleas are knowing and voluntary."  United States v. *Longoria,* 113 F.3d 975,

22  977 (9th Cir. 1997). Due process requires that the defendant be informed of the "critical" elements of the

23  offense. *United States v. Pena*, 314 F.3d 1152, 1157–58 (9th Cir. 2003). Assuming that "notice of the

24  true nature, or substance, of a charge [does not] always require[ ] a description of every element of the

25  offense," the Court limited its holding to "critical" elements.  *Henderson v. Morgan 426 U.S. 637,* 647

26  (1976).  Defendant claims that the incorrectly defined intent element, "willfulness," requires the Court to permit

27  Defendant to withdraw from the plea.  Defendant refers to the following: "And number three, that in filing that

28  false corporate tax return, you acted willfully, *which essentially means you knew that the return contained false*

1    *information.* (Exhibit 16., at p. 17, lines 1-11.)  The model Ninth Circuit instruction definition for willfulness for

2    offense of 26 U.S.C. § 7206(1) is: "defendant knew federal tax law imposed a duty on him [i.e., file an

3    accurate tax return] and he intentionally and voluntarily violated that duty. Ninth Circuit Model Jury

4    Instruction, 9.42.  It appears Defendant is claiming Defendant had no idea that the law imposed upon

5    him a legal duty to file a correct tax return.  But the colloquy and the facts admitted by Defendant

6    support willfulness. Moreover, the facts support a willfulness showing, meaning that Defendant knew he

7    had a duty to correctly file an accurate tax return with the IRS. The Court asked Defendant if he signed,

8    under penalties of perjury, API's 2009 and 2010 tax returns.  In the plea agreement, Defendant admitted

9    not disclosing bank accounts to API's accountant prior to filing API's 2009 and 2010 Forms 1120 and to

10   altering API's accounting records provided to API's accountant, demonstrating he knew he was required

11   to report a correct tax return. (Exhibit 10, at p. 3, ¶ f.)  Defendant stated he understood the charges

12   against him at his arraignment and at the change of plea hearing. This challenge should be denied.

13         Additionally, defense's theory that filing false returns to evade creditors, such as unionizing

14   employees, somehow is a defense is erroneous.  Defendant conflates tax evasion, 26 U.S.C. § 7201, with

15   making and subscribing a false tax return, in violation of 26 U.S.C. § 7206(1). While a defense that a

16   defendant was attempting to hide assets or defraud creditors may be a valid defense for tax evasion (the

17   government must prove Defendant committed an affirmative act (e.g., filing a false tax return) to evade

18   taxes and not for some other purpose), it irrelevant when the charge is filing a false tax return.

19         2.   <u>The Government Did not Breach The Plea</u>

20         "Plea agreements are contracts and are enforced as such." *United States v. Allen*, 434 F.3d 1166,

21   1174 (9th Cir.2006). The defendant relinquishes his constitutional right to a trial by entering into a plea

22   agreement, and "[t]he integrity of our judicial system requires that the government strictly comply with

23   its obligations under a plea agreement." *Id*. Under the plea agreement, each party was entitled to present

24   and argue additional facts relevant to sentencing. (Exhibit 10, ¶ 8); see also *United States v. Cannel*, 517

25   F.3d 1172, 1176 (9th Cir. 2008). A district court has discretion in determining what remedy is

26   appropriate for breach of a plea agreement. *Anderson,* 970 F.2d at 608; *United States v. Boatner,* 966

27   F.2d 1575, 1580 (11th Cir.1992).

28

1    Defendant asserts that the Government breached the plea agreement by including tax loss from

2    2008 that the parties agreed to and by asserting that Defendant filed false 2009 and 2010 amended

3    Forms 1120 for API.

4    What Defendant fails to tell the Court is that it was he who challenged the figures in the plea

5    agreement.  He now brazenly blames the Government for an issue he caused. On February 16, 2017, and

6    again on March 24, 2017, Defendant signed a plea agreement admitting the tax loss he caused by filing false 2009

7    and 2010 tax returns for API caused a loss of $1,584,055.  (Exhibits 10 & 14, ¶ 7.)  The plea agreement permits

8    the parties to agree to modify the plea agreement. (Exhibit 10, ¶ 11.)  Shortly before the July 7, 2017

9    sentencing, Defendant attempted to lower the tax loss in the plea agreement and, in doing so, attempt to change

10   the Guidelines agreed to in the plea agreement—an act expressly prohibited by the plea agreement. (See Exhibit

11   10, ¶ 7 & 14.).  Defendant even filed a stipulation referencing this breach: "parties to work out a minor dispute

12   regarding some calculations." (Dkt. No. 17.)  Notwithstanding this apparent breach, the Government

13   undertook the task of reanalyzing the tax loss based on Defendant's newly raised arguments regarding timing of

14   deposits.  As Defendant's own counsel points out, the tax loss was likely much higher than included in the plea

15   agreement due to fraud Defendant committed in other years that was under investigation when Defendant's

16   attorney contacted the Government.  Mr. Cannon stated: "there are other issues and other years, that with

17   additional investigation could potentially lead to a higher guideline calculation. Due to this uncertainly,

18   and because to the plea agreement, the parties do not object to the loss calculations in the PSR, which

19   are based on the plea agreement . . . ." (Exhibit 18.)  The Government even provided an advanced copy

20   of its supplemental memorandum to the defense. (Exhibit 18, at p. 5.) In Defendant's own supplemental

21   sentencing memorandum filed on October 4, 2017, signed by defense counsel, states "We are not

22   disputing the tax loss, but would just like to point out that the difficult in coming to firm tax loss

23   numbers . . . ." (Dkt. No. 18, at p. 3, line 4.)  At sentencing, the parties agreed to guidelines range.

24   Where the parties agree on the tax loss, the Government cannot be said to have breached the plea

25   agreement. In fact, Defendant's newly raised arguments required the Government to analyze the 2008

26   and 2009 years because Defendant contended that certain income API earned in 2009 and 2010 was

27   deposited in later years. In the end, Defendant's tax loss was lowered by about $40,000.  Also, by the

28   terms of the plea agreement, Defendant's dispute over the tax loss alleviated the Government of all

1    promises in the plea agreement. (Exhibit 10, ¶¶ 10 & 14.) To permit a Defendant to challenge the tax

2    loss in violation of the plea agreement while at the same time holding the Government to a tax loss it did

3    not agree to is contrary to the terms of the plea agreement and encourages sandbagging.

4          Defendant also claims that the Government's arguments about the falsity of API's amended tax

5    returns were a breach of the agreement. The plea agreement specifically states "I agree that regardless of

6    any other provision of this Agreement, the government may and will provide the Court and the

7    Probation Office with all information relevant to the charged offense and the sentencing decision."

8    (Exhibit 10, ¶ 8.) While the Government was incorrect in its computation, which was caused by API's

9    incorrect tax filings, it was corrected prior to sentencing. The language of the plea allowed the

10   Government to provide the Court with information about API's underreporting of income on amended

11   tax returns Defendant signed.  None of the amounts identified in the Government's supplemental

12   sentencing memorandum were included in Defendant's tax loss or asked to be included.

13          **C.  Defendant has Been Sentenced, And the Court Should Not Resentence Defendant**

14          The Government incorporates its arguments in Section (B)(2), above, of this memorandum regarding

15   Defendant's claims that the Government made improper sentencing arguments. In short, the parties agreed to the

16   revised tax loss and the plea agreement allows the Government to provide the Court with "all information

17   relevant to the charged offense and the sentencing decision," which includes API's amended Forms

18   1120 for 2009 and 2010 that underreported income and were signed by Defendant.

19          Turning to Defendant's conflicts claim, under the Sixth Amendment, a criminal defendant has

20   the right to be represented by counsel whose loyalties are undivided. *United States v. Christakis*, 238

21   F.3d 1164, 1168–69 (9th Cir. 2001). "To establish a sixth amendment violation based on a conflict of

22   interest, a defendant must show (1) that counsel actively represented conflicting interests, and (2) that an

23   actual conflict of interest adversely affected his lawyer's performance." *Id*.  Many allegations against

24   Defendant's former defense counsel have been made, but the Government does not have discovery from

25   former defense counsel to determine whether he was a conflicted counsel or not. For the Government to obtain

26   this information, an evidentiary hearing is needed so that the Government can subpoena records over which

27   Defendant has waived privilege and question former defense counsel at the hearing regarding those matters for

28   which Defendant has waived privilege.  To rely on the current state of the record would be to rely blindly on the

1   statements of Defendant regarding his communications and involvement with former defense counsel, which the

2   Government is not prepared to do.  Accordingly, should the Court's deny all of defense's claims save this

3   challenge, the Government requests additional time to obtain records from former defense counsel.

4   **D.  Evidentiary Hearing & Fed. R. Evid. 410**

5       The Court can and should deny Defendant's motion on the papers. If the Court is not prepared to

6   deny Defendant's motion on the papers, the United States respectfully requests an evidentiary hearing

7   on the motion.  At an evidentiary hearing, the Government would be permitted to call former defense

8   counsel to discuss the conversations he had with Defendant regarding the nature and consequences of

9   the plea, discussions the two had in English, and question him about Defendant's allegations of threat or

10  side-promises. The Government asks that Court to reserve ruling on the use of the plea agreement

11  should the Court permit Defendant to withdraw from his guilty plea.  In the plea agreement, Defendant

12  agreed to the facts in paragraph 2 of the plea, agreed that such facts are admissible against him under

13  Fed. R. Evid. 801 (d)(2)(A) in any subsequent proceeding, including at trial, in the event he violates any

14  of the terms of this Agreement, and expressly waive any and all rights under Fed. R. Crim. P. 11(f) and

15  Fed. R. Evid. 410. (Exhibit 10, ¶ 6.) Such an issue should be reserved for motions in limine prior to trial.

16                      **IV.      CONCLUSION**

17      For the foregoing reasons, the Government respectfully requests that the Court complete sentencing with

18  regard to restitution and Defendant's surrender date, and deny Defendant's Motion to Withdraw from his guilty

19  plea and deny his request to be resentenced.

20      Dated: January 5, 2018.                    BRIAN J. STRETCH
                                                    United States Attorney

21

22                                                  */s/ Jose A. Olivera*
                                                    JOSE A. OLIVERA

23                                                  Assistant United States Attorney

24

25

26

27

28